**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VICTORINOX AG, VICTORINOX SWISS ARMY, INC., and WENGER NA, INC., <br>     Plaintiffs/ <br>     Counterclaim-Defendants, <br><br>   v. <br><br> THE B & F SYSTEM, INC., <br>     Defendant/ <br>     Counterclaim-Plaintiff <br>   -and- <br><br> JOHN D. MEYER, ABC CORPORATIONS 1-10, and JOHN DOES 1-10, <br>     Defendants. | **Civil Action No.** <br> **13 CV 4534 (JSR)** <br> <u>ECF</u> |

### DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COLUCCI & UMANS
Frank J. Colucci (FC-8441)
David M. Dahan (DD-5864)
Katherine M. Lyon (KL-0269)
218 East 50th Street
New York, New York 10022
Telephone:  (212) 935-5700
Facsimile: (212) 935-5728
Email: Fcolucci@colucci-umans.com
   Ddahan@colucci-umans.com
   Klyon@colucci-umans.com


Natalma M. McKnew
*Admitted Pro Hac Vice*
Smith Moore Leatherwood LLP
300 E. McBee Avenue, Suite 500 (29601)
P.O. Box 87
Greenville, South Carolina 29602
Telephone:  (864) 240-2408
Facsimile:  (864) 240-2477
Email:  tami.mcknew@smithmoorelaw.com
*Counsel for Defendants The B & F System, Inc. and John D. Meyer*

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

I.      SUMMARY OF ARGUMENT ............................................................................ 1

II.     SUMMARY OF FACTS ...................................................................................... 4

III.    PLAINTIFFS' CLAIMS ARE BARRED IN
        THEIR ENTIRETY BY LACHES.................................................................... 7

        A.      SUMMARY JUDGMENT IS APPROPRIATE
                IN LACHES CASES ............................................................................ 7

        B.      PLAINTIFFS CANNOT REBUT THE
                PRESUMPTION OF LACHES ........................................................... 4

                1.      Plaintiffs Should Have Known of B & F's Sales of the
                        ROYAL CREST Knife for up to Thirty Years Prior to Filing this
                        Civil Action and Their Delay is Inexcusable (**p. 9**)

                2.      B & F Has Been Severely Prejudiced by Plaintiffs' Delay (**p. 13**)

                3.      B & F Seeks Equity With Clean Hands (**p. 15**)

                4.      Equity Supports A Finding of Laches (**p. 16**)

IV.     THERE IS NO LIKELIHOOD OF
        CONFUSION OR DAMAGE TO PLAINTIFFS....................................... 17

V.      THE REGISTRATION FOR THE
        RAL 2003 MARK SHOULD BE CANCELLED ........................................ 18

VI.     THIS CASE IS "EXCEPTIONAL" ENTITLING
        DEFENDANTS TO RECOVER ATTORNEY'S FEES ........................... 20

VI.     CONCLUSION ................................................................................................. 24

## TABLE OF AUTHORITIES

### CASES

*Am. Int'l Group, Inc. v. Am. Int'l Bank,*
926 F.2d 829 (9th Cir. 1991) ........................................................................... 10

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ........................... 7

*Black Diamond Sportswear, Inc. v. Black Diamond Equip., Ltd.,*
2007 U.S. App. LEXIS 23515 (2d Cir. Oct. 5, 2007) ........................... 8,9,13

*Brown v. Sixteen, Inc.,* 2009 U.S. Dist. LEXIS 36211
(S.D.N.Y. April 28, 2009) ........................................................................... 9,13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................. 7

*Chandon Champagne Corp. v. San Marino*, 335 F.2d 531 (2d Cir. 1964) ........................... 8,10,16

*Citibank, N.A. v. City Trust,*
756 F.2d 273 (2d Cir. 1985) ......................................................................... 12

*Columbia University v. Columbia/HCA Healthcare Corp.,*
964 F. Supp. 733 (S.D.N.Y. 1997) .............................................................. 17

*Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187 (2d Cir. 1996) ........................... 8,13

*Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. Cal. 2001) ................... 13

*Deere & Co. v. MTD Holdings, Inc.,*
2004 U.S. Dist. LEXIS 2550 (S.D.N.Y. 2004) ...................................... 14, 15

*Dial-A-Mattress Operating Corp. v. Mattress Madness,*
841 F. Supp. 1339 (E.D.N.Y. 1994) ............................................................ 19

*Dixon v. American Tel. & Tel. Co.*, 159 F.2d 863 (2d Cir.),
*cert. denied*, 332 U.S. 764 (1947), *rehearing denied*, 332 U.S. 839 (1947) ................... 7

*Eppendorf-Netheler-Hinz GmbH v. Enterton Co.,*
89 F. Supp. 2d 483 (S.D.N.Y. 2000) .............................................. 7,8,9,13,16

*Emmpresa Cubana del Tabaco v. Culbro Corp.,*
213 F.Supp.2d 247 (S.D.N.Y. 2002) ............................................................ 9

*Gasser Chair Co. v. Infanti Chair Mfg. Corp.*,
1991 U.S. Dist. LEXIS 12515 (E.D.N.Y. Aug. 19, 1991)...............................................7

*Gear, Inc. v. L.A. Gear California, Inc.*,
670 F. Supp. 508 (S.D.N.Y. 1987) ...............................................19

*Gordon & Breach Sci. Publishers S.A. v.
Am. Inst. of Physics,* 166 F.3d 438 (2d Cir. 1999)...............................................21

*Johnston v. Standard Mining Co.*, 148 U.S. 360 (1893) ...............................................9

*Mackall v. Casilear,* 137 U.S. 556 (1890) ...............................................17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)...............................................7

*Medinol Ltd. v. Neuro Vasx, Inc.*,
67 U.S.P.Q.2d 1205 (T.T.A.B. 2003) ...............................................19

*Metro Traffic Control v. Shadow Network,*
104 F.3d 336 (Fed. Cir. 1997) ...............................................19,20

*Orient Express Trading Co. v. Federated Dep't Stores, Inc.*,
842 F.2d 650 (2d Cir. 1988) ...............................................19

*Pilates, Inc. v. Current Concepts*,
120 F. Supp. 2d 286 (S.D.N.Y. 2000) ...............................................19

*Polaroid Corp. v. Polarad Elecs. Corp.*, 182 F. Supp. 350
(E.D.N.Y. 1960), *aff'd*, 287 F.2d 492 (1961) ...............................................9,13

*Procter & Gamble Co. v. Johnson & Johnson Inc.*,
485 F. Supp. 1185 (S.D.N.Y. 1979),
*aff'd without op*, 636 F.2d 1203 (2d Cir. 1980)...............................................10

*RBC Bearings v. Peer Bearing Co.*,
676 F. Supp. 2d 9, 24 (D. Conn. 2009), *aff'd*,
2010 U.S. App. LEXIS 25641 (2d Cir. Dec 5, 2010)...............................................8,11,15,16,17

*Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037 (2d Cir. 1980) ...............................................8

*Saul Zaentz Co. v. Wozniak Travel, Inc.*,
627 F. Supp. 2d 1096 (N.D. Cal. 2008)...............................................12

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
588 F.3d 97 (2d Cir. 2009) ...............................................17

*Warner Lambert Co. v. McCrory's Corp.,*
718 F. Supp. 389 (D.N.J. 1989) ................................................................................... 12


## FEDERAL RULES, STATUTES and C.F.R.

Fed.R.Civ.P. 56(c) ......................................................................................................... 7

Fed.R.Civ.P. 56(e) ......................................................................................................... 7

15 U.S.C. § 1115(b)(1) ................................................................................................. 18

15 U.S.C. § 1117(a) ................................................................................................ 20,21

37 C.F.R. 2.33(b)(1) ..................................................................................................... 19

Defendants The B & F System, Inc. and John D. Meyer (collectively, "B & F") respectfully submit this memorandum of law together with the declarations of John D. Meyer ("J. Meyer Decl.,"), William Meyer ("W. Meyer Decl."), Nicole Deyton ("Deyton Decl.") and Frank J. Colucci ("Colucci Decl.") in support of their motion for summary judgment as to all causes of action alleged by Plaintiffs in their complaint, as well as for judgment in favor of The B & F System on its Counterclaim to Cancel Plaintiffs' U.S. Registration No. 3,546,920. Defendants' "Rule 56.1 Statement of Material Facts on Which There is No Genuine Issue To Be Tried" ("Facts") is also submitted herewith.

## I.    SUMMARY OF ARGUMENT

This civil action is an unwarranted and belated attempt by Plaintiffs to assert rights to a trademark that is unenforceable, meriting summary judgment in favor of Defendants. First, the most fundamental and time honored principles of equity dictate that summary judgment on the grounds of laches be entered, namely that "equity aids the vigilant, not those who sleep on their rights." In 1983, B & F began selling the accused product, a "multifunction" pocket knife with red colored handles. (Facts, ¶ 6) Since then B & F has continuously and overtly sold approximately 2,500,000 units of the product nationwide for 30 years up to the filing of the Complaint on June 28, 2013. (Facts, ¶ 9). Since 1987, B & F has sold its red multifunction pocket knives under its own ROYAL CREST trademark (hereinafter the "ROYAL CREST Knife") without a single instance of a consumer actually confusing it with either of Plaintiff Victorinox's or Plaintiff Wenger's products. (Facts, ¶ 7) These critical facts have not and cannot be disputed by Plaintiffs.

The Complaint in this civil action alleges that the ROYAL CREST Knife infringes Plaintiffs' trademark for the color red on multifunction knives. Plaintiffs consist of two separate companies, companies that compete with each other for sales of red multifunction knives --

Victorinox and Wenger.[1]  Victorinox did not even seek to register the color red as a trademark until it filed an application with the United States Patent and Trademark Office ("USPTO") in October 2005, months after Victorinox acquired Wenger and 22 years after B & F's first sales of its red multifunction knives.  (Facts, ¶ 29)  However, there is no evidence that either Victorinox or Wenger considered the color red alone to be a source identifying trademark of either company at the time B & F began using red in 1983 since many companies were also using red at the time. Significantly, in 1997 the Second Circuit ruled that the color red on Victorinox's multifunction pocket knife lacked secondary meaning and was unenforceable as a mark – the very mark Victorinox and Wenger now ask the Court to enforce against Defendants.[2]

Plaintiffs attempt to excuse their inaction and delay in objecting to B & F's 30 years of sales of the ROYAL CREST Knife through the absolutely incredible claim that they "first learned" of B & F's sales of its red multifunction pocket knife in March 2013, not through any actions of their own, but when U.S. Customs in Dallas detained an incoming shipment of B & F's knives.  (Cplt., ¶¶ 2, 33)  Plaintiffs' assertion flies in the face of common sense.  Their obligation to police and enforce the rights in their mark and the undisputed record before the Court shows that B & F and Plaintiffs have had substantial opportunities to encounter each other in the market and trade during the last 30 years.  B & F and Plaintiffs have been part of the same knife trade and industry, have attended the same trade shows, have shared a "Rep Group" and are part of the same trade organizations such as the American Knife & Tool Institute and the Advertising Specialty Institute.   (Facts, ¶¶ 32, 34, 35, 43-45)  B & F and Plaintiffs have long sold red handled multifunction pocket knives through numerous similar and identical retail

---

[1] Plaintiffs Victorinox AG and Victorinox Swiss Army will be collectively referred to as "Victorinox" herein and Wenger NA, Inc. as "Wenger."

[2] In the *Forschner Group, Inc. v. Arrow Trading Co., Inc.* case (discussed *infra* at pp. 6), Forschner sought to enjoin Arrow Trading's use of the term "Swiss Army knife" to describe its red multifunction pocket knife along with a claimed product trade dress that included the color red as an element.  *Forschner Group*, 124 F.3d 402, 404 (2d Cir. 1997).

outlets such as Walmart, Sears, Amazon.com and specialty sports and knife outlets. (Facts, ¶¶ 20, 21, 22, 41, 42)  Further, B & F and Wenger have had direct contact regarding the ROYAL CREST knife at issue when B & F's former and current president of B & F, William and John Meyer traveled to Switzerland in 1987 to meet with representatives of Wenger SA (current Plaintiff Wenger NA's parent) in Switzerland in 1987 to discuss the possibility of Wenger supplying B & F with red handled multifunction knives. (Facts, ¶ 45)  While no deal was reached, Wenger expressed no objection to B & F's sales of red handled multifunction knives. (*Id.*)

Plaintiffs are sophisticated and long-standing companies with substantial resources at their disposal.  The evidence demonstrates that had Plaintiffs exercised even minimal diligence in policing their alleged trademark in the color red at any point over the past 30 years, they would have easily discovered the ROYAL CREST Knife.  Despite the fact that Plaintiffs consider multifunction pocket knives bearing the Red Handle Mark to be the "symbol of the company" (Cplt., ¶ 18), they have long practiced a "see no evil, hear no evil approach" to policing this symbol by doing nothing to object to dozens of third parties also using red in connection with multifunction pocket knives.  Consequently, there is no issue of material fact that Plaintiffs have slept on their alleged rights and that the Complaint is barred by laches.

The undisputed facts that establish laches also demonstrate that there is no likelihood of confusion between B & F and any of Plaintiffs nor has there been any throughout the past 30 years.  Plaintiffs' allegations of trademark infringement have no basis in fact since Victorinox and Wenger have long coexisted with numerous companies using red as the color of multifunction knives, including B & F, without any consumers actually confusing the source of multifunction knives by virtue of the color red. (Facts, ¶¶ 24, 25)  Moreover, Plaintiffs cannot

claim any monetary damages as a result of B & F's sales of the ROYAL CREST Knife, which they claim to have not known about until March 2013.  (Facts, ¶ 50)

Further, the Registration for the Red Handle Mark should be cancelled in light of Victorinox's demonstrably false statements to the USPTO that the color red had acquired distinctiveness and that Victorinox was the "substantially exclusive" user of the color red as the handle color of multifunction pocket knives despite Wenger's long and co-extensive use of red in competition with Victorinox and, further not disclosing the *Forschner* ruling noting other users of the color red and refusing to hold that Victorinox's red had acquired secondary meaning. (Facts, ¶ 51)

## II.   SUMMARY OF FACTS

The complete factual background supporting this motion is set forth in the accompanying 56.1 Statement and the Supporting Declarations of John Meyer, William Meyer, Frank J. Colucci, Nicole Deyton, and only a pertinent summary will be repeated herein.

B & F has been in business for over 60 years as a wholesaler of numerous products, including cookware, kitchen cutlery and sporting knives.  (Facts, ¶¶ 1, 5)  However, B & F and its affiliated company, Meyerco, have built and acquired significant renown and market presence in the knife industry and are recognized for their innovative and quality knife products.  (Facts, ¶¶ 12, 13)  Since 1987, when B & F adopted ROYAL CREST and the ROYAL CREST shield design as trademarks for its multifunction knives, the B & F red ROYAL CREST Knife has been promoted and sold in substantially the following form.  (Facts, ¶ 7)



Over the past 30 years, B & F has extensively promoted and sold the ROYAL CREST Knife through its catalogs, which are mailed to thousands of retail customers nationwide, through its appearance at trade shows, through its internet website, through sales reps, and through indirect advertising conducted by B & F customers, many of whom are retailers who sell the ROYAL CREST Knife through their own channels, including through shopping sites such as Amazon.com (Facts, ¶ 9). The ROYAL CREST Knife has been one of B & F's strongest sellers and is frequently reordered by many of its major customers.

Plaintiffs' Complaint and much of the evidence they have submitted in this case outlines the history of the multifunction or "swiss army knife" dating from 1897, when Victorinox and Wenger each separately manufactured "swiss army knives" for the Swiss Army. (Facts, ¶ 29) Victorinox and Wenger sell a wide variety of multifunction knives through retail outlets such as Amazon.com and Sears.com. (Facts, ¶¶ 22, 42)

Though Victorinox and Wenger have been under common ownership since 2005, they continue to maintain different management, different brands and sell different products including different multifunction knives that they sell under their respective VICTORINOX and WENGER housemarks in a variety of handle colors such as black, blue, yellow and the color red. (Facts, ¶¶

30, 52)  However, the issue in this case comes down not just to the color red, but to a single shade of red.  The basis of the Complaint is U.S. Registration No. 3,546,920 of the color "Red (RAL 3003)" which issued on December 16, 2008 to Plaintiff, Victorinox Ag.  RAL 3003 is designated as a *rubinrot* or "ruby" colored shade of red (the "RAL 3003" Mark).[3]  *Rubinrot* is one of approximately 20 different red shades according to the RAL classification system.   Thus, Plaintiffs claim exclusivity to the *rubinrot* shade of red with respect to a single specified product identified as a "multifunction pocket kni[fe]" in the Registration.[4]

Significantly, in 1997 the Second Circuit ruled directly on the validity of the very trademark now at issue before the Court, holding that Victorinox's[5] Red Handle Mark had no secondary meaning and was therefore unenforceable, 14 years after B & F's sales of the ROYAL CREST Knife had commenced:

> With these principles in mind, we find that **Forschner has failed to establish that the color red on the handles of Forschner's multifunction pocketknife has acquired secondary meaning. The use of the color red on handles of multifunction pocketknives does not indicate in the minds of the public a single source of origin in Victorinox**. The record indicates that for nearly forty years, at least two different and competing Swiss companies, Victorinox and Wenger, have manufactured Swiss Army knives with red handles and the cross-and-shield logos for distribution in the United States. For nearly the same length of time, an American company, Colonial, has marketed a multifunction pocketknife with red handles and a two bar cross design under its SWISS MASTER trademark, and the purchasing public has referred to its product as a Swiss Army knife. As such, **the trade dress consisting of the color red as applied to multifunction pocketknives does not serve to primarily designate Forschner as the single source of the product nor does it serve to distinguish Forschner's product from those of its competitors**.

*Forschner Group, Inc. v. Arrow Trading Co., Inc.,* 125 F.3d 402, 408 (2d Cir. 1997) (emphasis added).

---

[3] RAL is a color matching system used in Europe originally created in Germany in 1927 by the *Reichs-Ausschuß für Lieferbedingungen und Gütesicherung.*

[4] B & F notes that these types of "multifunction knives," which feature a blade and an additional implement such as a screwdriver, bottle opener or corkscrew, are commonly referred to by the public and in the trade as a "swiss army knife" to denote the product category.  However, Plaintiffs claim trademark rights to the term "Swiss Army Knife," though this alleged trademark of Plaintiffs is not at issue in the case at bar.

[5] The plaintiff in this civil action, Forschner Group, was Victorinox's exclusive U.S. distributor.

## III.  PLAINTIFFS' CLAIMS ARE BARRED IN THEIR ENTIRETY BY LACHES

### A.  <u>SUMMARY JUDGMENT IS APPROPRIATE IN LACHES CASES</u>

Under Federal Rule 56(c) summary judgment is appropriate where the movant establishes that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  On a motion for summary judgment, although the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party, the burden is on the opponent to come forward with "specific facts" showing that there is a "genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(e) .  "The mere existence of a scintilla of evidence in support" of the non-movant's position is insufficient and the party opposing summary judgment must show the existence of a genuine issue of material fact, "not merely one that is colorable." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In the context of a claim for a trademark infringement, laches is an appropriate issue for summary judgment.  *See Black Diamond Sportswear, Inc. v. Black Diamond Equip., Ltd.*, 2007 U.S. App. LEXIS 23515 (2d Cir. Oct. 5, 2007); *Eppendorf-Netheler-Hinz GmbH v. Enterton Co.*, 89 F. Supp. 2d 483 (S.D.N.Y. 2000) (defendants' motion for summary judgment based on laches granted; 8 year delay); *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 1991 U.S. Dist. LEXIS 12515 (E.D.N.Y. Aug. 19, 1991) ("[T]he issues raised by a laches defense are particularly amenable to resolution by summary judgment.") (*citing Dixon v. American Tel. & Tel. Co.*, 159 F.2d 863, 864 (2d Cir.), *cert. denied*, 332 U.S. 764 (1947), *rehearing denied*, 332 U.S. 839 (1947)).

Moreover, laches is a threshold issue that must be resolved prior to reaching the merits of any of Plaintiffs' trademark claims. *Black Diamond Sportswear, Inc.*, 2007 U.S. App. LEXIS 23515 at *2-*3; *RBC Bearings v. Peer Bearing Co.*, 676 F. Supp. 2d 9, 24 (D. Conn. 2009), *aff'd*, 2010 U.S. App. LEXIS 25641 (2d Cir. Dec. 5, 2010).

## B.   PLAINTIFFS CANNOT REBUT THE PRESUMPTION OF LACHES

The defense of laches to alleged acts of trademark infringement has long been recognized and applied in this Circuit to bar stale claims. *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 193 (2d Cir. 1996) (affirming dismissal of trademark infringement claims on laches grounds); *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1040-41 (2d Cir. 1980) (affirming grant of summary judgment on trademark claims on laches grounds) (citing cases). Laches bars claims for both injunctive and monetary relief. *Id.*, 625 F.2d at 1041; *Eppendorf*, 89 F. Supp. 2d at 485.

Laches is established by demonstrating that the "plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time.'" *Saratoga Vichy*, 625 F.2d at 1040; *Conopco*, 95 F.3d at 192 (elements of laches are prejudice to the defendant caused by plaintiff's unreasonable delay in bringing the action). All three of these elements are present in this case.

The laches clock starts ticking from the time the plaintiff knew or in the exercise of reasonable diligence should have known of the alleged infringement. *Chandon Champagne Corp. v. San Marino*, 335 F.2d 531, 535 (2d Cir. 1964). "Actual knowledge on the plaintiff's part is not required; rather, the issue is whether the plaintiff 'knew or should have known about the alleged infringing use.'" *Conopco*, 95 F.3d at 191. "The objective standard of 'knew or should have known' is a logical implementation of the duty to police one's mark." *Armco, Inc. v.*

*Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1161 (5th Cir. 1982); *Black Diamond*, 2007 U.S. App. LEXIS 23515, at *3 (noting that a trademark owner has a "duty to police its rights against infringers.").

A presumption of laches applies in a trademark action if the plaintiff "fails to bring suit within the . . . statute of limitations applicable to state-law fraud" claims, which is 6 years. *Eppendorf-Netheler-Hinz v. Enterton Co.,* 89 F.Supp.2d 483, 486 (S.D.N.Y. 2000); *see also Emmpresa Cubana del Tabaco v. Culbro Corp.,* 213 F.Supp.2d 247, 278 (S.D.N.Y. 2002).  As set forth in greater detail below, exercising even miminal diligence, Plaintiffs should have known about the B & F Knife that was first sold in about 1983 well before June 28, 2007, six years prior to the filing of the instant civil action.   Therefore the presumption of laches applies and the burden shifts to Plaintiffs to show why laches should not be applied in this case.  *Brown v. Sixteen, Inc.*, 2009 U.S. Dist. LEXIS 36211 at *17-18 (S.D.N.Y. April 28, 2009).

     1.     **Plaintiffs Should Have Known of B & F's Sales of the**
                 **ROYAL CREST Knife for up to Thirty Years Prior to Filing this**
                 **Civil Action and Their Delay is Inexcusable**

In order to obtain summary judgment, B & F does not have to prove that Plaintiffs had actual knowledge of the ROYAL CREST Knife -- only what Plaintiffs should have known in the exercise of reasonable diligence.  *RBN Nice Bearings, Inc. v. Peer Bearing Co.*, 410 Fed. Appx. 362, 2010 U.S. App. LEXIS at **4-5 (2d Cir. Dec 5, 2010).  Plaintiffs are charged "with such knowledge as [they] might have obtained upon inquiry, provided the facts already known by [them] were such as to put upon a man of ordinary intelligence the duty of inquiry." *Polaroid Corp. v. Polarad Elecs. Corp.*, 182 F. Supp. 350, 355 (E.D.N.Y. 1960), *aff'd*, 287 F.2d 492 (1961) (quoting *Johnston v. Standard Mining Co.*, 148 U.S. 360, 370 (1893)).  Ultimately, "a plaintiff may be barred when the defendant's conduct has been open and no adequate justification

for ignorance is offered." *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 535 n. 17 (2d Cir. 1964).

Trademark owners have a fundamental obligation to exercise diligence in policing their trademarks for infringing uses. *See Procter & Gamble Co. v. Johnson & Johnson Inc.*, 485 F. Supp. 1185, 1207 (S.D.N.Y. 1979), *aff'd without op*, 636 F.2d 1203 (2d Cir. 1980) ("[T]he trademark law not only encourages but requires one to be vigilant on pain of losing exclusive rights . . ."). "Companies expecting judicial enforcement of their marks must conduct an effective policing effort." *Am. Int'l Group, Inc. v. Am. Int'l Bank,* 926 F.2d 829, 834 (9th Cir. 1991).

B & F has promoted, advertised and sold the ROYAL CREST Knife through hundreds of thousands of catalogs, through prominent industry and trade publications, through its own website (www.bnfusa.com) and the websites of numerous other companies. (Facts, ¶¶ 8-12, 18-21) B & F has openly displayed and promoted the ROYAL CREST Knife at the SHOT Show, the premier knife industry trade show, that is attended by Plaintiffs' representatives on an annual basis, and which B & F has attended every single year since 1988. (Facts, ¶¶ 32-40; J. Meyer Decl., ¶¶ 55-61) B & F and its affiliated company Redline have promoted the ROYAL CREST Knife at numerous other national and regional industry trade shows each year, including the Promotional Products Association International Expo, also attended by Plaintiffs. (Facts, ¶¶ 38-39; J. Meyer Decl., ¶¶ 59-61) Sales of the ROYAL CREST Knife have been open and notorious and through retail outlets where Plaintiffs' own products are sold, such as Amazon.com, Sears.com and Walmart.com. (Facts, ¶¶ 3, 19-22, 41, 42;  J. Meyer Decl., ¶¶ 69-80, 83-85) Defendants' customers of the ROYAL CREST Knife have included Ace Hardware, Big 5 Sporting Goods, DHL Airways, Mary Kay Cosmetics, and the Smoky Mountain Knife Works of Tennessee. (Facts, ¶ 19; J. Meyer Decl., ¶ 67)

The ROYAL CREST Knife has been publicly sold for all to see since 1983 and Plaintiffs had reason to know of its sales or inquire further long before it claims to have "first learned" of the ROYAL CREST Knife.  Despite the fact that Plaintiffs claim a first use in commerce date of 1936 for its Red Handle Mark, the record shows that Plaintiffs have completely failed to police the Red Handle Mark throughout the years.  (Facts, ¶¶ 24, 49, 53; J. Meyer Decl., ¶¶ 90-103, Exs. 121-122, 127-129, 133-149; Colucci Decl., ¶¶ 10, 11, 13)  It is undisputed that neither Victorinox nor Wenger ever objected to any third party's use of a red handle for multifunction knives during the entire decade of the 1980's when B & F first adopted red and began to successfully sell and promote the ROYAL CREST Knife.  (Facts, ¶ 6, 25, 53; J. Meyer Decl., ¶¶ 91, 98, Exs. 135, 143)  Victorinox did not even apply to register the color red as a trademark until 2005, an action clearly precipitated by its acquisition of its competitor Wenger months earlier (Facts, ¶ 29).  There is an overwhelming number of red handled multifunction pocket knives on the market today, many sold open and notoriously through the same channels as Plaintiffs' red handled multifunction knives such as Home Depot, Frost Cutlery, and Amazon.com.  (Facts, ¶¶ 24, 53; Deyton Decl., ¶¶ 6, 8-106, Ex. A; J. Meyer Decl., ¶¶ 93, 101-103, Exs. 127, 128, 146, 148).  The extensive presence of third parties using red handles for multifunction pocket knives plainly evidences a lack of vigilance by Plaintiffs in policing the Red Handle Mark.  *See RBC Bearings v. Peer Bearing Co.*, 676 F. Supp. 2d 9, 26-27 (D. Conn. 2009) (widespread third party use of mark at issue evidences failure to police).  In fact, the evidence shows that Plaintiffs *never* take any action with respect to multifunction pocket knives that are red and only raise an objection if the party is using "Swiss Army" – which is also another of Plaintiffs' alleged trademarks.   Plaintiff Wenger does not even have a single employee whose responsibility includes monitoring for infringements!  (Colucci Decl., ¶ 9, Ex. 1 (Eskridge Dep., 28:24-29:4)).

Plaintiffs' failure to police is even more glaring considering the variety of methods currently available to trademark owners to monitor the market for infringers, particularly through the internet where alleged infringers can be uncovered with the stroke of a key.   Plaintiffs claim exclusivity with respect to a particular shade of a color on a very specific item, a multifunction pocket knife, thus Plaintiffs' alleged exclusivity is embodied in an easily identifiable item, i.e., if it is red and a multifunction knife, Plaintiffs claim it infringes their Red Handle Mark.  (Facts, ¶ 54; Colucci Decl., ¶ 12, Ex. 2 (Stutz Dep., 111:2-10))  The notion that Victorinox or Wenger, both substantial companies with considerable resources at their disposal, did not have the opportunity to view the ROYAL CREST Knife or discover facts that would have caused a reasonable businessman to inquire further throughout the past thirty years is absurd and should not be credited. *See Warner Lambert Co. v. McCrory's Corp.,* 718 F. Supp. 389, 395 (D.N.J. 1989) ("It … seems doubtful that industry leader Warner-Lambert could have no knowledge that its own customer and major retailer,  McCrory, was selling a product that Warner-Lambert now contends poses the danger of irreparable harm.") (citing *Citibank, N.A. v. City Trust*, 756 F.2d 273, 275 (2d Cir. 1985)), *see also*, *Saul Zaentz Co. v. Wozniak Travel, Inc.*, 627 F. Supp. 2d 1096 (N.D. Cal. 2008) ("[P]laintiff is not a trademark owner with few resources available to conduct a policing effort and defendant's use of the [mark at issue] has not been secretive, negligible, or sporadic"; laches of 18 years barred trademark infringement claim).

Where a plaintiff indisputably has a sustained period of opportunity to have discovered the alleged infringement of a defendant operating in the open, the laches "clock" is deemed to begin running.  The Second Circuit stated in affirming summary judgment on the grounds of laches in a similar case involving an alleged infringement that would have been discovered had the plaintiff policed its trademark rights:

> [Defendant] marketed its products in widely distributed catalogues, at yearly trade shows in which [Plaintiff] and [Defendant] both participated, and through retail stores

nationwide, including in [Plaintiff's] home state of Vermont. The district court correctly found that, if [Plaintiff] had policed any of these obvious distribution channels from 1990 onwards, it would have known that the likelihood of confusion with BDE's skiwear products 'loom[ed] large.' [citation omitted]. Accordingly, we conclude that no genuine issue of material fact exists regarding the existence of 'a provable infringement claim' by the mid-1990s....

*Black Diamond Sportswear, Inc. v. Black Diamond Equip., Ltd.*, 2007 U.S. App. LEXIS 23515, 7-8 (2d Cir. Vt. Oct. 5, 2007), *see also*, *Brown v. Sixteen, Inc.*, 2009 U.S. Dist. LEXIS 36211 at *4-5, *16 (S.D.N.Y. April 28, 2009) ("Exercising any due diligence, Plaintiff should have known about the [alleged infringement] eleven years prior to commencing the current suit"; summary judgment granted on laches grounds).

Consequently, there is no issue of fact with respect to Plaintiffs' numerous opportunities and avenues to discover the ROYAL CREST Knife and their failure to police any of "obvious distribution channels" where the ROYAL CREST Knife has been sold over the course of the past 30 years. Thus, Plaintiffs are "chargeable with such knowledge as[they] might have obtained upon inquiry" and they cannot rebut the presumption of laches on the grounds that they only became aware of the ROYAL CREST Knife in March 2013. *See Polaroid,* 182 F. Supp. at 355.

### 2.      B & F Has Been Severely Prejudiced by Plaintiffs' Delay

Two types of prejudice are implicated in a laches analysis. "One form of prejudice is the decreased ability of the defendants to vindicate themselves that results from the death of a witness or on account of fading memories or stale evidence." *Eppendorf,* 89 F.Supp.2d at 487 *(quotation omitted), see also, Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. Cal. 2001) ("Evidentiary prejudice includes such things as lost, stale, or degraded evidence, or witnesses whose memories have faded or who have died"). A second form of "prejudice ensues when a 'defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed.'"" Conopco, 95 F.3d at 192.

B & F and its employees have had to recall events and search for documents going back to over 30 years ago.  Both B & F's and Plaintiffs' witnesses have testified that they do not know or cannot remember several important events. There has been a turnover of employees of B & F over the course of the past 30 years that has deprived B & F of knowledgeable witnesses. Severely prejudicial to B & F is the fact that it no longer possesses records regarding the distribution of its catalogs containing the ROYAL CREST Knife, sales and customers of its ROYAL CREST Knife during the period beginning with its first sale in 1983 and continuing over 20 years through to the time it fully converted to electronic record keeping.  (Facts, ¶ 15; J. Meyer Decl., ¶ 62)  Also lost to the sands of time are documents and correspondence memorializing the Meyers' meeting with Wenger's management in Switzerland in 1987 to discuss the possibility of Wenger becoming a manufacturer of red handled knives for B & F.  (J. Meyer Decl., ¶ 81; W. Meyer Decl., ¶ 8, Ex. 3).  Wenger also no longer has any correspondence regarding this meeting.  There can be no genuine dispute that the passage of thirty years has adversely impacted B & F's ability to defend itself against Plaintiffs' claims.  Thus, B & F has unquestionably suffered evidentiary prejudice.

Furthermore, B & F will clearly be prejudiced by having to discontinue a product offering that it has sold successfully for approximately 30 years, a product that constitutes 2.38% of its total knife sales.  (J. Meyer Decl., ¶ 66.)  Moreover, B & F stands to lose substantial goodwill with its manufacturers and more than 3,000 customers of the ROYAL CREST Knife that it has built over the course of 30 years.  (Facts, ¶ 19; J. Meyer Decl., ¶ 67)  *See Deere & Co. v. MTD Holdings, Inc.*, 2004 U.S. Dist. LEXIS 2550, *60-61 (S.D.N.Y. 2004) (10 year delay that would cause defendant "great expense" and loss of inventory establishes prejudice; laches bars claim).  Defendants' belief that its continued sales of the ROYAL CREST Knife were proper was entirely reasonable and justifiable in light of Plaintiffs' 30 year delay and the prevalence of a

-14-

multitude of third party red handled pocketknives on the market, as well as B & F's reliance on the *Forschner* decision.  (J. Meyer Decl., ¶ 90).  *See RBC Nice Bearings, Inc.*, 676 F. Supp. 2d at 26-27.

Consequently, the undisputed facts establish that both forms of prejudice are present here and Plaintiffs cannot overcome the presumption of prejudice.

### 3.  B & F Seeks Equity With Clean Hands

As a matter of equity, a party seeking to establish laches "must come with clean hands." *Deere & Co. v. MTD Holdings, Inc.*, 2004 U.S. Dist. LEXIS 2550, *60-61 (S.D.N.Y. Feb. 18, 2004).   Thus, a party that has acted as a consciously fraudulent infringer cannot establish laches. *Id*.

The Complaint alleges that B & F has intentionally infringed the Red Handle Mark. However, Plaintiffs cannot present any evidence that in 1983 B & F adopted red as a color for multifunction pocket knives "with the intent of confusing the public." *Deere & Co. v. MTD Holdings, Inc.*, 2004 U.S. Dist. LEXIS 2550, *60-61 (S.D.N.Y. Feb. 18, 2004).  Aside from the fact that red is a popular color, B & F considered that the red-handled pocket knife it saw in Japan was attractive and that it would sell well.

There is no evidence that in 1983 any party, even either Victorinox or Wenger, considered the color red by itself as an indication of the source of multifunction knives since there were several separate companies selling red multifunction pocket knives at the time (including Victorinox, Wenger, Wenger's U.S. distributor Precise and Colonial). (Facts, ¶¶ 24, 28; J. Meyer Decl., ¶¶ 91, 92, Exs. 135, 137)  Prior to 1983 and for (22) twenty-two years after Victorinox and Wenger competed in the marketplace for sales of red multifunction pocket knives, neither took any actions that would have put anyone on notice, actual or constructive, that the color red is a trademark. (Facts, ¶¶ 49, 53)  Neither Victorinox nor Wenger had applied

to register the color red as a trademark with the USPTO prior to 1983 and did not attempt to do so until 2005. Even if B & F was aware that both Victorinox and Wenger, as well as Colonial, were separately using red as a color for their multifunction pocket knives by virtue of each company's large share of the multifunction knife market, there was no evidence of any public confusion occurring as a result of these separate competing companies selling red-handled multifunction knives. Moreover, it is axiomatic that awareness alone does not evidence bad faith. *RBC*, 2010 U.S. App. LEXIS 25641 ("[M]ore than mere knowledge is required; to forestall the laches defense, there must be a finding of the infringer's intent to promote confusion or exploit plaintiff's good will or reputation."); *Eppendorf*, 89 F. Supp. 2d at 488.

Consequently, there is no evidence of any bad faith on B & F's part. *See RBC Bearings*, *676* F. Supp. 2d at 25-26 (defendants' testimony that the mark at issue was adopted "because everyone in the industry was already using these designations" held to be consistent with good faith; summary judgment on grounds of laches entered).

### 4.      Equity Supports A Finding of Laches

The record establishes that B & F's conduct has been open and readily discoverable to Plaintiffs for 30 years. (Facts, ¶¶ 7-12, 16-22, 32-47; J. Meyer Decl., ¶¶ 55-61, 63-67, 69-85, 108) Plaintiffs had every opportunity to enforce their claimed rights to the color red and failed to act in a commercially reasonable manner to protect the rights they now assert based on the facts readily available to them. Neither equity nor the prevailing law in this Circuit permits parties to stick their heads in the sand as a regular business practice in ignoring alleged infringers and then assert their claimed rights decades later. Since no "adequate justification" for Plaintiffs' ignorance can be offered," the Complaint should be dismissed. *Chandon Champagne*, 335 F.2d at 535.

Barring Plaintiffs' claims in this case is consistent with the underlying equitable purposes of the laches doctrine to alleviate the Court's burden of having to try stale claims. *See RBC Bearings,* 676 F. Supp. at 27 ("The doctrine of laches is based upon grounds of public policy, which require for the peace of society the discouragement of stale demands . . .") (*quoting Mackall v. Casilear,* 137 U.S. 556, 566, 11 S. Ct. 178, 34 L. Ed. 776 (1890)).

## IV.   THERE IS NO LIKELIHOOD OF CONFUSION OR DAMAGE TO PLAINTIFFS

There is no evidence of any likelihood of confusion between Plaintiffs' red multifunction knives and B & F's red multifunction knives.  Plaintiffs' simultaneous claims of ignorance of B & F and the ROYAL CREST Knife on the one hand and likelihood of confusion on the other hand are completely untenable since there is no evidence whatsoever that any consumers have been confused between the parties' products or are likely to be confused.  *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 117 (2d Cir. 2009) (11 years of coexistence with no actual confusion supports finding of no likely confusion).  Plaintiffs' passive consent over the years to a multitude of red handled multifunction knives also eviscerates any claim that they have suffered any losses or damages as a result of B & F's sales.  The fact that neither Victorinox nor Wenger has been the exclusive U.S. user of the color red for multifunction pocket knives, has allowed numerous parties to use red in connection with a vast array of red multifunction pocket knives.  (Facts, ¶¶ 24, 53; Deyton Decl., ¶¶ 6, 8-106, Ex. A; J. Meyer Decl., ¶¶ 91-103). Where a mark is in such widespread use with respect to a product, the likelihood of confusion between any two users is virtually eliminated.  *See Columbia University v. Columbia/HCA Healthcare Corp.*, 964 F. Supp. 733 (S.D.N.Y. 1997) (substantial third party use of "Columbia" in healthcare field negates likelihood of confusion; complaint dismissed).

This conclusion is reinforced by the undisputed fact that Victorinox's and Wenger's long history of competition was predicated on an explicit understanding between the companies that

there was no likelihood of confusion among consumers as to the source of each companies

respective red multifunction pocket knives. (Facts, ¶ 28) As a result, each party could use red for

multifunction pocket knives without interference by the other, though neither could prevent any

third parties from also using red. This understanding between Victorinox and Wenger continues

through to the present, since are two separate companies selling competing products.

## V.     THE REGISTRATION FOR THE RAL 2003 MARK SHOULD BE CANCELLED

It is undisputed that at the time Victorinox AG applied to register the red-handled, multi-

tool pocket knife, it made the following statement to the United States Patent and Trademark

Office ("PTO"):

> The Mark has become distinctive of the identified goods through the Applicant's
> substantially exclusive and continuous use and promotion of the mark in commerce as an
> indication of source since at least as early as October 30, 1936.

(Counterclaim, ¶ 6; Answer to Counterclaim, ¶ 6) (emphasis added).

It also is undisputed that as of the filing date of the Application on October 14, 2005,

Victorinox had no objective, good faith basis to claim it had "substantially exclusive and

continuous use" of the color red in connection with multifunction pocket knives since 1936

because of the Second Circuit's decision in *Forschner Group, Inc. v. Arrow Trading Co., Inc.*,

124 F.3d 402 (2d Cir. 1997), discussed above in Point II (p. 6), which found that the color red on

multifunction pocketknives does not serve as a source indicator. Indeed, Victorinox's statements

to the PTO fall well short of "the 'uncompromising candor' that is required of applicants before

that agency." *See Orient Express Trading Co. v. Federated Dep't Stores, Inc.*, 842 F.2d 650, 653

(2d Cir. 1988).

A trademark registration procured through fraud may be cancelled at any time, even if the

registration has become "incontestable." *See* 15 U.S.C. § 1115(b)(1). Fraud in procuring a mark

occurs when an applicant knowingly makes false, material representations of fact in connection

with an application. *Metro Traffic Control v. Shadow Network,* 104 F.3d 336, 340 (Fed. Cir.

1997).   A party seeking cancellation of a registered trademark must establish the alleged fraud

by clear and convincing evidence. *Orient Express Trading Co.*, 842 F.2d at 653; *Gear, Inc. v.

L.A. Gear California, Inc.,* 670 F. Supp. 508, 513 (S.D.N.Y. 1987).   Fraudulent intent may be

inferred from objective manifestations in the circumstances. *Medinol Ltd. v. Neuro Vasx, Inc.*,

67 U.S.P.Q.2d 1205 (T.T.A.B. 2003).

      In the *Orient Express Trading Co.* case, the Second Circuit affirmed Judge Motley's

decision cancelling nineteen registered trademarks:

> Based on the evidence before her, Judge Motley concluded that appellants' dates
> of first use on the trademark applications and the subsequent affidavits filed pursuant to
> sections 8 and 15 of the Lanham Act were 'greatly exaggerated.' She also found that Lee
> had been 'disingenuous' in filing the seventeen 1981 applications and the subsequent
> affidavits, intentionally attempting to capitalize on SeaCo's anticipated business profits
> and preparing for 'vexatious' litigation. Finally, she concluded that appellants' claimed
> scope of use of the registered marks had been exaggerated and that the continuous use
> claimed in the section 8 and 15 affidavits had, in fact, been 'sporadic, at best.'

842 F.2d at 653.   The Court affirmed the finding of fraud based on the clear and convincing

evidence and correspondingly dismissed the plaintiff's claims of trademark infringement and

unfair competition. *Id.* at 653-54; *see also Pilates, Inc. v. Current Concepts*, 120 F. Supp. 2d

286, 314 (S.D.N.Y. 2000) (trademark registrant's statement in application to PTO that equipment

mark had been used continuously in commerce constituted clear and convincing evidence of

material and knowing misrepresentations to PTO warranting cancellation or registration).

      Moreover, a trademark applicant must disclose those users who are known to have a right

to use the same or a related mark. *Dial-A-Mattress Operating Corp. v. Mattress Madness*, 841 F.

Supp. 1339, 1353 (E.D.N.Y. 1994); *see* 37 C.F.R. 2.33(b)(1).   At the time of its application,

Victorinox failed to disclose that Wenger likewise had the historical right, and indeed, continued

to use red as trademark for multi-function pocket knives under its own WENGER housemark

and through its own distribution channels. (Facts, ¶ 30).   Thus, the fact that Wenger and

-19-

Victorinox may have been under common ownership (for 6 months) at the time of the application is completely immaterial since the color red did not indicate a single source of origin with Victorinox, as the Second Circuit noted in the *Forschner* decision.

Moreover, even if Victorinox could claim at the time of the application that it had "substantially exclusive" use of the mark, it had no basis for stating that such "substantially exclusive" use dated back to 1936. (Facts, ¶¶ 24, 25, 53; J. Meyer Decl., ¶¶ 90-103) Such a statement transcends the bounds of being merely false and is patently fraudulent. This was no misunderstanding or inadvertence, but, rather, an intent to deceive in light of the binding authority signified by this Court's decision in *Forschner*. Such a material omission was misleading and germane to the PTO's assessment of whether to grant a trademark registration. Unlike in *Metro Traffic Control,* 104 F.3d at 341, here there was a "conscious effort to obtain for his business a registration to which he knew it was not entitled."

Consequently, summary judgment on B & F's counterclaim for cancellation of Victorinox's trademark registration is appropriate.

## VI.  THIS CASE IS "EXCEPTIONAL" ENTITLING DEFENDANTS TO RECOVER ATTORNEY'S FEES

The Lanham Act permits the recovery of attorney's fees to a prevailing party in "exceptional" cases. 15 U.S.C. § 1117(a). This is an exceptional case.

Plaintiffs accuse not only B & F the company, but its president John Meyer, of not only trademark infringement and unfair competition, but also of counterfeiting, a criminal offense. Notwithstanding such inflammatory and unsupported allegations not a scintilla of evidence of any actual or likelihood of confusion among the purchasing public between plaintiffs' and defendants' pocket knives has emerged in over 30 years of contemporaneous usage. (J. Meyer Decl., ¶ 110) None of Plaintiffs' executives professed to have had any knowledge of any of either Defendants or their use of the trademark ROYAL CREST in connection with red handle

-20-

multifunction pocket knives for over 30 years, notwithstanding that defendants' have clearly advertised and sold their ROYAL CREST red multifunction pocket knives in numerous catalogs, at all of the important trade shows, as well as on the internet, alongside of Plaintiffs and their own customers, retailers and distributors without a word from Plaintiffs.  (Colucci Decl., ¶ 13) Prior to filing this civil action, Plaintiffs were well aware of Defendants' long prior use of the color red on multifunction pocket knives by virtue of  B & F's petition to cancel the Red Handle Mark in the Trademark Trial and Appeal Board ("TTAB")  yet they nevertheless proceeded full steam ahead.  (Cplt, ¶ 3)

Further, none of Plaintiffs specified what damages, if any, in lost sales or profits, they have sustained as a result of Defendants' sales of its red handle pocket knives for over 30 years. (Colucci Decl., ¶ 13)  Based on the evidence and testimony offered by Plaintiffs in this case, it is apparent that this civil action is not the product of businessmen damaged in any way by the Defendants' activities, but rather the product of Plaintiffs' attorneys, seeking to use Plaintiffs' vastly superior financial resources to coerce defendants into an unjust and unfair settlement.

Consequently, we respectfully submit that Plaintiffs filed and prosecuted this case in bad faith, entitling Defendants to recover their attorney's fees.  *See Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics,* 166 F.3d 438, 439 (2d Cir. 1999) (per curiam) (attorney's fees should be awarded under 15 U.S.C. § 1117(a) on evidence of bad faith).

## VII.   CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court grant summary judgment in their favor and dismiss Plaintiffs' claims in their entirety and enter judgment in favor of Defendants on their counterclaim to cancel Plaintiffs' U.S. Registration No. 3,546,920.

Dated:  New York, New York                 Respectfully submitted,
           December 2, 2013

                                                   Frank J. Colucci (FC-8441)
                                                   David M. Dahan (DD-5864)
                                                   Katherine M. Lyon (KL-0269)
                                                   Colucci & Umans
                                                   218 East 50th Street
                                                   New York, New York 10022
                                                   Telephone:  (212) 935-5700
                                                   Facsimile: (212) 935-5728
                                                   Email: Fcolucci@colucci-umans.com
                                                              Ddahan@colucci-umans.com
                                                              Klyon@colucci-umans.com

                                                   Natalma M. McKnew
                                                   *Admitted Pro Hac Vice*
                                                   Smith Moore Leatherwood LLP
                                                   300 E. McBee Avenue, Suite 500 (29601)
                                                   P.O. Box 87
                                                   Greenville, South Carolina 29602
                                                   Telephone:  (864) 240-2408
                                                   Facsimile:  (864) 240-2477
                                                   Email:  tami.mcknew@smithmoorelaw.com

                                                   *Counsel for Defendants The B & F System, Inc. and
                                                   John D. Meyer*

## CERTIFICATE OF SERVICE

It is hereby certified that on December 2, 2013, a copy of "Defendants' Memorandum in Support of Motion for Summary Judgment" has been delivered by hand to plaintiffs' attorneys, as follows:

> David Weild III
> Rory J. Radding
> H. Straat Tenney
> EDWARDS WILDMAN PALMER LLP
> 750 Lexington Avenue
> New York, New York 10022
> dweild@edwardswildman.com
> stenney@edwardswildman.com
> rradding@edwardswildman.com
> *Counsel for Plaintiffs*

Dated this 2nd day of December, 2013 at New York, New York.

David M. Dahan

-23-