### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | X | |
| VICTORINOX AG, VICTORINOX SWISS ARMY, INC., and WENGER NA, INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Civil Action No.:  13 Civ. 4534 (JSR) |
| -against- | : | |
| THE B & F SYSTEM, INC. and JOHN D. MEYER, ABC CORPORATIONS 1-10, and JOHN DOES 1-10, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | X | |
| THE B & F SYSTEM, INC., | : | |
| | : | |
| Counterclaim Plaintiff, | : | |
| | : | |
| -against- | : | |
| VICTORINOX AG, VICTORINOX SWISS ARMY, INC., and WENGER NA, INC., | : | |
| | : | |
| Counterclaim Defendants. | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | X | |

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

AM 25241045.2

I.      Table of Contents

I.      TABLE OF CONTENTS ...................................................................................... 2

II.     TABLE OF AUTHORITIES .............................................................................. 4

PRELIMINARY STATEMENT .................................................................................. 1

        A.     The Famous Swiss Army Knife ................................................................ 3

        B.     Defendants' Infringing Knives ................................................................. 3

UNDISPUTED FACTS ................................................................................................. 4

SUMMARY JUDGMENT STANDARD ..................................................................... 5

ARGUMENT ................................................................................................................. 5

I.      DEFENDANTS' CONDUCT CONSTITUTES TRADEMARK
        INFRINGEMENT ............................................................................................ 5

        A.     The Swiss Army Trade Dress and Red Mark Have Acquired Secondary
               Meaning. ................................................................................................. 6

               1.     Victorinox Has Expended Substantial Advertising Dollars ....................... 7

               2.     The Swiss Army Trade Dress and Red Mark Has Been Recognized
                      In Unsolicited Media Coverage. ................................................... 8

               3.     Multiple Consumer Surveys Confirm That Consumers Associate
                      The Color Red With Plaintiffs. .................................................. 11

               4.     Products Bearing the Red Mark and the Swiss Army Trade Dress
                      Have Enjoyed Great Sales Success. ........................................... 12

               5.     Defendants and Other Third Parties Slavishly Copy The Swiss
                      Army Trade Dress. ..................................................................... 12

               6.     The Red Mark and the Swiss Army Trade Dress Have Been Used
                      Exclusively For Decades ............................................................ 13

               7.     Actual Confusion ...................................................................... 13

        B.     Defendants' Conduct Is Likely To Cause (and Has Caused) Confusion ........... 14

               1.     Strength of Plaintiffs' Trademark ............................................... 15

               2.     Degree of Similarity Between Marks .......................................... 15

               3.     The Products Are Identical ........................................................ 16

               4.     Because The Products Are Identical, There Is No Gap To Be
                      Bridged ..................................................................................... 17

               5.     Instances of Actual Confusion ................................................... 17

               6.     Sophistication of Relevant Purchasers ....................................... 18

               7.     Quality of Defendants' Products ................................................ 18

               8.     Defendants' Bad Faith Adoption of the Mark ............................. 19

II.      DEFENDANTS CONDUCT VIOLATES NEW YORK COMMON LAW .................. 21

III.     CONCLUSION.............................................................................................................. 21

II.    Table of Authorities

**CASES**                                                                                            **PAGE**

*20th Century Wear, Inc. v. Sanmark-Stardust, Inc.,*
   815 F.2d 8 (2d Cir. 1987).................................................................................. 14

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)......................................................................................... 5

*Bristol-Myers Squibb Co., v. McNeil-P.P.C., Inc.,*
   973 F.2d 1033 (2d Cir. 1992)........................................................................... 7

*Cartier, A Div. of Richemont N.A., Inc. v. Symbolix, Inc.,*
   454 F. Supp. 2d 175 (S.D.N.Y. 2006)............................................................... 5

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.,*
   348 F. Supp. 2d 217 (S.D.N.Y. 2004)................................................... 17,18,19,24

*Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.,*
   830 F.2d 1217 (2d Cir. 1987)...................................................................... 7,8,14

*Chanel, Inc. v. Veronique Idea Corp.,*
   795 F. Supp. 2d 262 (S.D.N.Y. 2011)............................................................ 6,16

*Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,*
   933 F.2d 162 (2d Cir. 1991)........................................................................... 14

*Columbia Pictures Indus. v. Screen Gems Film Co., Inc.,*
   No 99 Civ. 4407 (WHP), 2001 WL 1254838 (Oct. 18, 2001 S.D.N.Y.)................. 16

*Expressway Music, Inc. v. Slep-Tone Entm't Corp.,*
   2013 WL 5345969 (S.D.N.Y. Sept. 23, 2013)..................................................... 6

*GTFM, Inc. v. Solid Clothing, Inc.,*
   215 F. Supp. 2d 273 (S.D.N.Y. 2002).............................................................. 7

*Gucci Am., Inc. v. Action Activewear, Inc.,*
   759 F. Supp. 1060 (S.D.N.Y. 1991).................................................................. 6

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.,*
   286 F. Supp. 2d 284 (S.D.N.Y. 2003)............................................................. 16

*Harlequin Enters. Ltd. v. Gulf & W. Corp.,*
   644 F.2d 946 (2d Cir. 1981)........................................................................... 7

*Hasbro, Inc. v. Lanard Toys, Ltd.,*
   858 F.2d at 70 (2d Cir. 1988)......................................................................... 18

*Horn's, Inc. v. Sanofi Beaute, Inc.,*
   963 F. Supp. 318 (S.D.N.Y. 1997).................................................................. 23

*Johnson & Johnson v. Actavis Group hf,*
   No. 06-Civ-8209, 2008 U.S. Dist. LEXIS 17680 (S.D.N.Y. Feb. 21, 2008)............ 8

*Koch v. Town of Brattleboro, Vt.,*
   287 F.3d 162 (2d Cir. 2002)............................................................................ 5

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,*
   799 F.2d 867 (2d Cir. 1986)........................................................................... 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986)......................................................................................... 5

*Melodrama Publ'g, LLC v. Santiago,*
   No. 12 Civ. 7830(JSR), 2013 WL 1700929 (S.D.N.Y. Apr. 11, 2013)................... 20

*Mobil Oil Corp v. Pegasus Petroleum Corp.,*
   818 F.2d 254 (2d Cir. 1987)........................................................................... 22

*Morningside Group, Ltd. v. Morningside Capital Group, L.L.C.*,
    182 F.3d 133 (2d Cir. 1999)........................................................................ 21
*N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*,
    704 F. Supp. 2d 305 (S.D.N.Y. 2010)........................................................ 20
*Paddington Corp. v. Attiki Importers 7 Distributors, Inc.*,
    996 F.2d 577 (2d Cir. 1993)........................................................................ 16
*Perfect Fit Indus., Inc. v. Acme Quilting Co.*,
    618 F.2d 950 (2d. Cir. 1980)....................................................................... 24
*Playboy Enters. v. Chuckleberry Publ.*,
    687 F.2d 563 (2d Cir. N.Y. 1982).............................................................. 8
*Polaroid Corp. v. Polarad Elects. Corp.*,
    287 F.2d 492 (2d Cir. 1961)........................................................................ 15
*Recot, Inc. v. Becton*,
    214 F.3d 1322 (Fed. Cir. 2000)................................................................... 20
*Sports Auth., Inc. v. Prime Hospitality Corp.*,
    89 F.3d 955 (2d Cir. 1996)...................................................................... 6,17
*Sunbeam Prods. v. West Bend Co.*,
    123 F.3d 246 (5th Cir. 1997) ...................................................................... 12
*Thompson Medical Co. v. Pfizer, Inc.*,
    753 F.2d 208 (2d Cir. 1985)........................................................................ 8
*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
    800 F. Supp. 2d 515 (S.D.N.Y. 2011)....................................................... 19
*Venetianaire Corp. of Am. v. A & P Import Co.*,
    302 F. Supp. 156 (S.D.N.Y. 1969) ............................................................ 21
*Virgin Enters. Ltd. v. Nawab*,
    335 F.3d 141 (2d Cir. 2003).......................................................... 19,20,21
*Whimsicality, Inc. v. Battat*,
    27 F. Supp. 2d 456 (S.D.N.Y. 1998).......................................................... 6

## STATUTES

15 U.S.C. § 1127 ............................................................................................. 17
15 U.S.C. §1115 ................................................................................................ 4

## RULES

Fed. R. Civ. P. 56 ............................................................................................. 5

## PRELIMINARY STATEMENT

This is a motion for summary judgment that defendants The B & F System, Inc. and John D. Meyer's (collectively, "Defendants") continued importation and sale of red-handled multifunction knives, which are slavish copies of the iconic SWISS ARMY knife, constitutes infringement, counterfeiting, false designation of origin, and unfair competition.

In 1897, Karl Elsener, founder of plaintiff Victorinox AG[1], developed a red-handled multifunction pocketknife in Ibach, Switzerland. *See* Declaration of H. Straat Tenney attached hereto ("Tenney Decl."), Ex. 1. This red pocketknife has become famous throughout the world under the SWISS ARMY brand ("Swiss Army Knives"). The Swiss Army Knife contains distinctive and famous trade dress, comprised of two red elongated oval-shaped plastic scales, a light-colored cross and shield device on one of the red scales, multiple silver metal implements that fold into the knife, and notches for tweezers (identified by the color gray) and a toothpick (identified by a tan color) ("Swiss Army Trade Dress"). *See* Tenney Decl., Ex. 7. In 2005, plaintiff Victorinox AG sought to protect an element of the Swiss Army Trade Dress by filing a trademark application for what-is-now U.S. Registration No. 3,546,920 covering two elongated oval-shaped red scales, with curved edges on the sides of the scales (the "Red Mark"). *See* Tenney Decl., Ex. 2. This federal trademark registration is prima facie evidence that the aforementioned mark is exclusively owned by Victorinox, and is valid and enforceable.[2] *See* 15 U.S.C. §1115(a). The Swiss Army Trade Dress and the Red Mark have served as source identifiers since its introduction in the United States in 1936. *See* Tenney Decl., Ex. 1.

---

[1]     Plaintiffs are Victorinox AG ("Victorinox"), Victorinox Swiss Army, Inc., ("VSAI"), and Wenger NA, Inc. ("Wenger NA") (collectively "Plaintiffs").

[2]     The registration issued after a rigorous review of the protectability and Victorinox's ownership of the color red for multifunction pocket knives by the United State Patent and Trademark Office, which included comprehensive evidence that the color red has acquired secondary meaning. (*See* Tenney Decl., Exh.7.).

The Swiss Army Knives became enormously popular in the United States at the end of World War II after American servicemen stationed in Europe brought them home to the States. In the United States alone, Plaintiffs have sold over 100 million knives bearing the Swiss Army Trade Dress, and invested more than $50 million in marketing expenditures to promote its distinctive trade dress. *See* Tenney Decl., Ex. 3.  Plaintiffs' Swiss Army Knives have become famous and are renowned for their quality, versatility, and dependability.  They are a part of American culture, with hundreds of references to the distinctive red color and pocket knife design in everything from unsolicited third party articles and novels to popular television shows, Broadway musicals and Hollywood movies.  Indeed, the distinctive Red Mark and Swiss Army Trade Dress, when used in connection with multifunction pocket knives, identify Plaintiffs to consumers as the source of the iconic knife and symbolize high quality, reliability, and versatility.

Plaintiffs' Swiss Army Knives are frequently copied by third parties seeking to trade on the fame, goodwill, and reputation associated with the products bearing the Swiss Army Trade Dress and the Red Mark. *See* Tenney Decl., Ex. 35, 36, 37, 37(a). Defendants have overtly and intentionally copied the exact design of Plaintiffs' Swiss Army Knives, as well as of Plaintiffs' products.  With blatant bad faith, Defendants maintain that Plaintiffs' iconic Red Mark is not protectable for lack of distinctiveness and that Defendants do not infringe.  Defendants' positions are without merit and lack substantiation.  Defendants' products are nothing more than inferior copies of Plaintiffs' Swiss Army Knives.  They infringe the protected features, the Red Mark and the product's Trade Dress, trade on the goodwill, fame and reputation associated with them, and thus confuse, mislead and deceive customers as well as third parties gifted with red handled multifunction knives as promotional items.

A.      **The Famous Swiss Army Knife**

SWISS ARMY is a famous and incontestable registered trademark (Registration No. 2,806,013), jointly owned by Victorinox AG and Wenger SA (a non-party) for use in connection with a variety of products, including Swiss Army Knives.

As a matter of Swiss defense procurement policy, it was originally required that there be at least two suppliers of Swiss Army Knives. *See* Tenney Decl., Ex. 1.  Victorinox produced its first knife for the Swiss armed forces in 1891.  *See* Tenney Decl., Ex. 1, at B8.  In 1901, Wenger SA was designated the second supplier.  It began producing knives of identical quality and did so as well for the civilian markets.  *See* Tenney Decl., Ex. 1.

Swiss Army Knives are not the same models as those distributed to Swiss soldiers, but nonetheless follow the same strict manufacturing standards that the Plaintiffs must adhere to, including tensile strength, yield strength, tolerances, and material.  The stainless steel is identical in all Swiss Army Knives, the aluminum and plastic components come from the same suppliers and each knife is inspected for quality of materials and manufacture. Victorinox acquired effective control of Wenger SA in 2005, and have a cooperative relationship concerning the sale of Swiss Army Knives. *See* Tenney Decl., Ex. 1. Since 2005, Victorinox and Wenger SA have continued to manufacture Swiss Army Knives as members in common of the Victorinox Group of Companies, and adhere to the rigid quality standards.[3]

B.      **Defendants' Infringing Knives**

Defendants import, offer for sale, and sell a line of red multifunction pocket knives ("Infringing Knives"). The Infringing Knives are designed and manufactured by companies in China and directly imported by Defendants into the United States, where the knives are

---

[3]      Both Victorinox and Wenger NA, as the exclusive North American distributor for Wenger SA, use cross and shield devices that are protected by multiple trademark registrations, including the incontestable U.S. Registration No. 3,077,338, owned by Victorinox AG, and Registration No. 3,820,133, owned by non-party Wenger SA.  *See* Tenney Decl., Exh. 58.

distributed to Defendants' retail customers who then sell or give away the counterfeit knives to the public.   Defendant B & F's identity is deliberately omitted from the packaging of the Infringing Knives.   Upon inspection, an Infringing Knife reveals no source – aside from "CHINA" stamped on a blade. See Tenney Decl., Ex. 40, 132:3-25; 133:17-21. Defendants' business model as a wholesaler is premised on selling unauthorized counterfeit copies of third parties' products.   The practice has resulted in multiple third-party enforcement actions against Defendants. *See* Tenney Decl., Ex. 74. Defendants' infringing conduct is willful because they have sold the Infringing Knife with the deliberate intention of creating an association with Plaintiffs' famous Swiss Army Knives.   Indeed, Defendants and their manufacturers have referred to the Infringing Knives as "Swiss Army" or "Swiss Army Type" knives, which signify a counterfeit product and an attempt to associate the Infringing Knives with Plaintiffs.   *See* Tenney Decl., Ex. 50-53.

Plaintiffs first became aware of Defendants and their unlawful importation of the Infringing Knives on March 25, 2013 when a United States Customs and Border Protection Officer ("U.S. Customs") contacted Plaintiffs' counsel concerning a shipment of over 2300 Infringing Knives in Dallas, Texas.  D.E. 1, Ex. B.  The Infringing Knives were detained under suspicion that they were counterfeit Swiss Army Knives. D.E. 1, Ex. C.  It was through this correspondence with U.S. Customs that Plaintiffs discovered that Defendant B & F was the importer and source of Infringing Knives in the United States.  Plaintiffs filed this action shortly thereafter.

## **UNDISPUTED FACTS**

The undisputed facts and related evidence entitling Plaintiffs to summary judgment are set forth in the accompanying Plaintiffs' Statement Pursuant to Local Rule 56.1 in Support of Its Summary Judgment Motion.  They will not be repeated here at length.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted "if the pleading, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is deemed "genuine" only if "the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) .

As the moving party, Plaintiffs bear the initial burden of showing that there are no issues of material fact for trial.  *Koch v. Town of Brattleboro, Vt.*, 287 F.3d 162, 165 (2d Cir. 2002).  The burden then shifts to the nonmoving party, who "must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 11, 587 (1986) (finding that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."), *cert. denied*, 481 U.S. 1029 (1987); *Cartier, A Div. of Richemont N.A., Inc. v. Symbolix, Inc.*, 454 F. Supp. 2d 175, 180 (S.D.N.Y. 2006) (same).  Nor may a party simply rely on allegations or denials in his own pleadings, conclusory allegations, conjecture, or speculation.  *Gucci Am,, Inc. v. Action Activewear, Inc.*, 759 F. Supp. 1060, 1062 (S.D.N.Y. 1991) (granting plaintiffs' motion for summary judgment on the issue of defendants' liability for trademark infringement and unfair competition).

## ARGUMENT

### I.   DEFENDANTS' CONDUCT CONSTITUTES TRADEMARK INFRINGEMENT

To prevail on its federal infringement claims, Plaintiffs must establish that (1) they have a valid mark that is protectable under the Lanham Act and (2) that Defendants' conduct is likely to cause confusion as to the source of their products. *Sports Auth., Inc. v. Prime Hospitality Corp.,*

89 F.3d 955, 960 (2d Cir. 1996); *see also Chanel, Inc. v. Veronique Idea Corp.*, 795 F. Supp. 2d 262, 266 (S.D.N.Y. 2011) (granting plaintiff's motion for summary judgment because defendants' sale of counterfeits is an admission of a likelihood of confusion).

    **A.**    <u>The Swiss Army Trade Dress and Red Mark Have Acquired Secondary Meaning.</u>

Both the Red Mark and the Swiss Army Trade Dress are inherently distinctive and, thus a showing of secondary meaning is not required. *See Expressway Music, Inc. v. Slep-Tone Entm't Corp.*, 2013 WL 5345969, at *2 (S.D.N.Y. Sept. 23, 2013) (citing *Whimsicality, Inc. v. Battat,* 27 F. Supp. 2d 456 (S.D.N.Y. 1998)). For the purposes of this motion, however, Plaintiffs will provide additional evidence of acquired distinctiveness to show that there is no genuine issue of material fact as to the validity of the Red Mark and the Swiss Army Trade Dress.

There is compelling, undisputed evidence that consumers associate the Red Mark and the Swiss Army Trade Dress with Plaintiffs alone. The Second Circuit has identified six non-exclusive factors in assessing the acquired distinctiveness or secondary meaning of a mark: (1) advertising expenditures, (2) unsolicited media coverage, (3) consumer studies linking the mark to a source, (4) sales success, (5) attempts to plagiarize the mark, and (6) the length and exclusivity of the use of the trademarks. *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 294 (S.D.N.Y. 2002) (quotations omitted) (*citing Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987)). Courts in the Second Circuit have also found that evidence of actual confusion carries a strong presumption of secondary meaning. *Harlequin Enters. Ltd. v. Gulf & W. Corp.*, 644 F.2d 946 (2d Cir. 1981).

No single factor is dispositive. *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987). The secondary meaning inquiry is the same for trademarks and trade dress. *Bristol-Myers Squibb Co., v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1042 (2d Cir. 1992). To prove secondary meaning, "every element need not be proved." *Thompson Medical*

*Co. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir. 1985).  Because the Red Mark has been approved for registration, it must be presumed that Plaintiffs' Red Mark is distinctive.  *See Playboy Enters. v. Chuckleberry Publ.*, 687 F.2d 563, 567 (2d Cir. 1982) (affirming permanent injunction against defendants' use of PLAYMEN).

### 1.       Victorinox Has Expended Substantial Advertising Dollars

The success of the Swiss Army Knives in the marketplace was accomplished, in part, by the investment of enormous resources and tremendous effort to advertise and promote the knives, as well as the Swiss Army Trade Dress and the Red Mark. Advertising need not explicitly direct the consumer's attention to the mark to constitute evidence of secondary meaning.  *See e.g., Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1222-23 (2d Cir. 1987); *Johnson & Johnson v. Actavis Group hf*, No. 06-Civ-8209, 2008 U.S. Dist. LEXIS 17680, at *6, 87 U.S.P.Q.2d 1125 (S.D.N.Y. Feb. 21, 2008) (finding that advertisements are relevant when they feature the Gold Mark and thus serve to link the NEOSPORIN mark and the color mark).

For over 70 years, Plaintiffs have worked with its retailers to advertise its famous Swiss Army Knives bearing the Swiss Army Trade Dress and the Red Mark in the U.S.  Since the 1980s, Plaintiffs have spent more than $50 million on advertising Swiss Army Knives in the U.S. alone. Virtually all the advertising and promotional materials depict the Swiss Army Trade Dress and Red Mark. *See* Tenney Decl., Ex. 4, 60.

Swiss Army Knives and, in particular, the Swiss Army Trade Dress, have been advertised, marketed, or otherwise recognized in many nationally circulated publications, such as *Life*, *Backpacker*, *Field & Stream*, *Popular Mechanics*, *Popular Science*, *Scouting*, *Vanity Fair*, *Ski*, *National Geographic Adventure*, *ESPN The Magazine*, and *Rolling Stone*.  Attached as Exibit 4 to the Tenny Decl. is a comprehensive list of advertisements with copies of the full advertisement annexed thereto.

Plaintiffs have consistently advertised the Swiss Army Trade Dress prominently in connection with a range of Plaintiffs' other products.  For example, the distinctive Red Mark has been featured in advertisements for products other than the Swiss Army Knife, including the September 1996 issue of *Backpacker*, which featured an advertisement for a watch flanked by the eight Swiss Army Knives. *See* Tenney Decl., Ex. 5.  Plaintiffs have also extended the use of the Red Mark to perfumes, chocolates, children's toys, bar-b-que sets, to name a few, further solidifying the consumer associations with the mark. *See* Tenney Decl., Ex. 6.  The Red Mark is used in this manner because it is the hallmark for Plaintiffs. *See* Tenney Decl., Ex. 44, 14:13-15:4. The reputation of quality, versatility and prestige associated with the Swiss Army Trade Dress defines Plaintiffs' products.

The Swiss Army Trade Dress is also promoted at thousands of retail locations throughout the United States through, *inter alia*, in-store displays.  Plaintiffs have also used Swiss Army Knife-themed displays to assist selling its watches.  For example, in the 1990s, the Red Mark was displayed as the minute hand on watches *See* Tenney Decl., Ex.  8, and point-of-sale displays prominently featured the Red Mark.  *See* Tenney Decl., Ex. 9.

### 2.      The Swiss Army Trade Dress and Red Mark Has Been Recognized In Unsolicited Media Coverage.

Victorinox has received numerous accolades and awards recognizing the quality, versatility, and design of the Swiss Army Knife.  Specifically, Swiss Army Knife was selected as a part of the permanent collection of the Museum of Modern Art in New York. *See* Tenney Decl., Ex. 10.  NASA used Swiss Army Knives as part of the standard equipment for the Space Shuttle Astronaut Crew, and since the 1960s, U.S. Presidents, Vice-Presidents, the CIA and FBI have all purchased Swiss Army Knives as a promotional tool or for active duty. *See* Tenney Decl., Ex. 11 & 12.  The Swiss Army Knife was listed as number 51 (of 999) in *Phaidon Design*

*Classics* (12083-12088), featured in *Swiss Made: New Architecture from Switzerland*, cited in the *MacMillan Visual Dictionary*, and seen in *The Best of Switzerland*. *See* Tenney Decl., Ex. 13, 14, & 15.  Each of the referenced publication prominently displayed an image of the Red Mark and the Swiss Army Trade Dress.

Along with this attention, Swiss Army Knives have won awards including the "Most Influential Gear of All time: Victorinox Swiss Army Knife" by *Outside.com*, and one of the "101 Gadgets That Changed The World" by *Popular Mechanics* in 2011. *See* Tenney Decl., Ex. 16, 17.  Also in 2011, Carl Elsener, Sr. (whose grandfather was Karl Elsener, founder of Victorinox and inventor of the Swiss Army Knife) was the first non-American inducted into the *Blade* (magazine) Hall of Fame. *See* Tenney Decl., Ex. 18 & 19. Tim Leatherman, founder and Chairman of Leatherman Tool Group (and a competitor of Victorinox), gave the induction speech as follows (in part): "This induction of Carl Elsener, Sr. is long overdue.  When you think about famous cutlery all over the world, the Victorinox Swiss Army Knife is instantly recognizable with its **bright red handle** and Swiss Cross on the side.  The knife is an icon and the company is an icon." *See* Tenney  Decl. Ex. 19.

Entire books have been devoted to the Swiss Army Knife, including *Swiss Army Knife Owner's Manual* by Michael M. Young (Oran V. Siler Printing Co. 2011), *Swiss Army Knives: A Collector's Companion* by Derek Jackson (Compendium Publishing Ltd. 1999), and *The Knife and Its History*, published in 1894 by Victorinox AG to celebrate its 100th anniversary.  *See* Tenney Decl., Ex. 20, 21, & 22. There has been at least one Swiss Army Knife fan club (the "Swiss Army Knife Society"), which published the "Crimson Cutter" newsletter. *See* Tenney Decl., Ex. 23 & 24.

Moreover, numerous national publications have recognized the Swiss Army Trade Dress as distinctive elements of Swiss Army Knives.  A representative sampling of the articles – which span decades – follow:[4]

- "Geneva offers everything that's good and expensive. There is, however, a new brand of cheap watches called Swatch in several stores, and many variations of the **imperishable red Swiss Army knife**, which make good souvenirs." Paul Hoffman, *What's Doing In Geneva*, N.Y. Times, Mar. 3, 1985 at sec. 10, p. 10 (emphasis added).

- "It is the Swiss army knife, with its **distinctive red handle bearing a white cross,** and in the minds of many it has become the symbol of this country – rivaling banks, watches, chocolates and the national airline."  William Tuohy, *Everything But The Kitchen Sink; Swiss Army Knives – Something Spies, GIs, Reagan Aides And Explorers Have In Common*, L.A. Times, July 9, 1987 at pt. 4, p. 1 (emphasis added)

- The compact Swiss Army knife, with its **distinctive red shell**, contains many tools – scissors, bottle opener, corkscrew, tweezers, blades, ballpoint pen and toothpick, to name a few."  *Travel Advisory: Gadget; The Cutting Edge*, N.Y. Times, Mar. 27, 1994 at sec. 5, p. 3 (emphasis added).

- "But sales of the **venerable – and ubiquitous – red knives with the white cross** quickly plunged in such shops when airports around the world imposed strict security restrictions after the Sept. 11 terrorist attacks in the United States."  Elizabeth Olson, *Swiss Knife Sales Slide at Airports*, N.Y. Times, Jan. 23, 2002 at sec. W, p. 1 (referring to Victorinox Swiss Army Knives) (emphasis added).

The Swiss Army Knife has achieved prominence in popular culture.  The iconic red knife is featured in the opening credits for every episode of the television series *MacGyver*, which originally aired on ABC from 1985 to 1992 and is now syndicated in over seventy different worldwide markets, including the United States, and played a prominent role in the 2008 movie *Get Smart*.   *See* Tenney Decl., Ex. 26 & 7, The Swiss Army Knife has been featured in comic strips.  *See* Tenney Decl., Ex.  27.  The Swiss Army Knife inspired the *Knife Ship I* and *Knife Ship II*, a two-part art installation featured at the Guggenheim Museum in New York in 1986-

---

[4]    A comprehensive list of references and full copies of the articles are attached to Tenney Decl., Exh.25.

1987 and Museum of Contemporary Art in Los Angeles in 1987 and again in 1995, which (not surprisingly) drew immediate comparisons to the Swiss Army Knife. *See* Tenney Decl., Ex. 28.

### 3. Multiple Consumer Surveys Confirm That Consumers Associate The Color Red With Plaintiffs.

Consumer research confirms that the Red Mark has acquired significant secondary meaning.[5]  For example, Dr. Alex Simonson of Simonson Associates, Inc. recently conducted a study to determine the level of secondary meaning of the color red that appears on the side of a Swiss Army Knife (the "Simonson Survey"). *See* Tenney Decl., Ex. 29.  The Simonson Survey found that a substantial percentage of consumers – 59% – recognize the color red on Swiss Army Knives as being associated with one company.  *Id*. at 2. Using a conservative methodology, Dr. Simonson calculated that the secondary meaning level of the color red, net of noise, was at least 38%, which is significant.  (*Id*.)

Dr. Simonson's conclusion is confirmed by market research previously conducted by Plaintiffs.  Specifically, Dr. Henry D. Ostberg concluded in 2008 that "the use of the color red in connection with a pocket knife has acquired secondary meaning for the Swiss Army brand." *See* Tenney Decl., Ex. 30, at Doc. Prod. # 6128.  In addition, in 1997 the market research firm Strategic Surveys International conducted a quantitative study to investigate perceptions and purchase behavior related to SWISS ARMY-branded products (the "SSI Study"). *See* Tenney Decl., Ex. 31.  The SSI Study found that red is the color most associated with SWISS ARMY, and a red background with a white shield and any cross will define SWISS ARMY.  *Id*. at Doc. Prod. #3428.  These studies thus evidence a strong association between the Red Mark, the Swiss Army Trade Dress and the SWISS ARMY brand.

---

[5]     Survey evidence is the most direct and persuasive evidence of secondary meaning.  *Sunbeam Prods. v. West Bend Co.*, 123 F.3d 246, 254 (5th Cir. 1997).  Consumer surveys are probative when granting summary judgment for a registered trademark owner.  *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 869 & n.1 (2d Cir. 1986).

### 4. Products Bearing the Red Mark and the Swiss Army Trade Dress Have Enjoyed Great Sales Success.

All of these efforts, accolades, and recognition have translated into sales success. SWISS ARMY is the leading national brand of multifunction pocket knives. Swiss Army Knives are sold by mass merchandisers (Wal-Mart, and Target), online retailers (Amazon.com and eBay.com), sporting goods stores (R.E.I. and Eastern Mountain Sports), hardware stores, specialty knife shops and department stores, as well as thousands of other retailers throughout the United States. *See* Tenney Decl., Ex. 32. Plaintiffs' U.S. revenues of Swiss Army Knives in the last 40 years total more than $700 million, with a retail value of over $1 billion. *See* Tenney Decl., Ex. 3. During this period, Plaintiffs sold more almost 100 million Swiss Army Knives. *Id.* Virtually all of those 100 million Swiss Army Knives contain the Swiss Army Trade Dress as the product design. *Id.* Indeed, a 2010 brand study conducted by Mullen Advertising, ranked consumer awareness of SWISS ARMY-branded products at nearly 100%, the top scoring brand among its competitors. *See* Tenney Decl., Exh. 33.

### 5. Defendants and Other Third Parties Slavishly Copy The Swiss Army Trade Dress.

"Intentional copying constitutes persuasive evidence of consumer recognition," and supports a finding of secondary meaning. *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 169 (2d Cir. 1991) *(citing 20th Century Wear, Inc. v. Sanmark-Stardust, Inc.,* 815 F.2d 8, 9-10 (2d Cir. 1987); *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.,* 830 F.2d 1217, 1224 (2d Cir. 1987) (noting that a finding of intentional copying was persuasive, if not conclusive, evidence that consumer recognition and goodwill inhered in the duplicated mark).

As a direct result of the pervasiveness of counterfeit versions of Plaintiffs' Swiss Army Knife, Plaintiffs have Exaustively enforced their intellectual property rights in the U.S. and have

sought to eliminate the knock-offs at their source – which is often in China.  *See* Tenney Decl., Ex. 34, 35, 36, 37, 37(a) & 40. Plaintiffs have initiated hundreds of intellectual property actions worldwide.  *See* Tenney Decl., Ex. 40.

### 6.      The Red Mark and the Swiss Army Trade Dress Have Been Used Exclusively For Decades.

Plaintiffs have been using the Swiss Army Trade Dress and the Red Mark on multifunction pocket knives continuously for over 70 years in the U.S.  (*supra*, at Ex. 2) Plaintiffs have garnered substantial commercial success.  (*supra*, at Ex. 3).  As discussed above, the popularity of the Swiss Army Knife has spurred a wave of counterfeiters (Defendants included).  As a result, there are multiple spurious knives in the marketplace.  These knives, however, are all infringers, and Plaintiffs' enforcement efforts are designed to stop them at their source. *See* Tenney Decl., Ex. 37.

### 7.      Actual Confusion

VSAI receives annually approximately 40-50 misdirected knives returned to its customer service facility in the U.S. *See* Tenney Decl., Ex. 38.  Normally, Victorinox enters the country of origin of the misdirected knife – usually "China" – or enters "not ours" into the database, and returns the knife to the customer with a brief note explaining that the knife is not a Victorinox or Wenger product.  *Id.* The vast majority of these returned knives are red. *Id.* Subsequent to the commencement of this action, Victorinox began photographing these misdirected knives. *See* Tenney Decl., Ex. 39.   Soon after this new procedure was enacted, Victorinox received one of Defendants' knives. *Id.*  Each of these misdirected knives (i) show that the public's associates the Red Mark with Plaintiffs; and (ii) constitute evidence of actual confusion.

### B.     Defendants' Conduct Is Likely To Cause (and Has Caused) Confusion

In determining infringement based on a likelihood of consumer confusion, the Second Circuit balances factors set forth in *Polaroid Corp. v. Polarad Elects. Corp*., 287 F.2d 492, 495 (2d Cir. 1961), namely: (1) the strength of the trademark, (2) the degree of similarity between the relevant marks, (3) the proximity of the products, (4) the likelihood that the prior owner will bridge the gap, (5) any instances of actual confusion, (6) the sophistication of relevant purchasers; (7) the quality of Defendants' products, and (8) whether Defendants adopted the marks in good faith.  *Id.*  No single factor is dispositive, and all of the factors shall be evaluated together to determine whether consumers are likely to be confused.  *Columbia Pictures Indus. v. Screen Gems Film Co., Inc.*, No 99 Civ. 4407 (WHP), 2001 WL 1254838, at *6 (Oct. 18, 2001 S.D.N.Y.) (*citing Paddington Corp. v. Attiki Importers 7 Distributors, Inc.,* 996 F.2d 577, 584 (2d Cir. 1993) (granting plaintiff's motion for summary judgment with respect to its causes of action for infringement).

Where the products are counterfeit, as they are here, a factor by factor analysis under the aforementioned *Polaroid* factors is not necessary because counterfeit marks are meant to confuse.[6]  *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) (indicating that "the Court need not undertake a factor-by-factor analysis under Polaroid because counterfeits, by their very nature, cause confusion."); *Chanel, Inc.*, 795 F. Supp. 2d at 267.

Defendants' products are counterfeit copies of Plaintiffs' Red Mark, and a likelihood of confusion analysis is not warranted. *See Gucci Am., Inc. v. Duty Free Apparel, Ltd*., 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) (noting that "confusing the customer is the whole purpose of creating counterfeit goods."). Notwithstanding, Plaintiffs demonstrate below that all of the

---

[6]     A "counterfeit" is "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127.

*Polaroid* factors are in Plaintiffs' favor and support Plaintiffs' claims of trademark infringement and counterfeiting.

### 1.    Strength of Plaintiffs' Trademark

As discussed in detail in Section I A, *supra*, Plaintiffs' Swiss Army Trade Dress used in connection with Swiss Army Knives is famous, distinctive and has acquired secondary meaning. This factor favors Plaintiffs.

### 2.    Degree of Similarity Between Marks

In examining this factor, the Court compares the respective marks to determine the impression conveyed to the public and whether the similarity between the marks is likely to cause consumer confusion. *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 245 (S.D.N.Y. 2004) (*citing Sports Auth., Inc., v. Prime Hospitality Corp.*, 89 F.3d 955, 962 (2d Cir. 1996)).   "Courts must appraise the overall impression created by . . . the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Cartier, Inc. v. Four Star Jewelry Creations, Inc*., 348 F. Supp. 2d 217, 245 (S.D.N.Y. 2004) (internal quotation omitted).   Because consumers will generally not see the two products side by side, the parties' respective products will be viewed in isolation, and therefore insignificant differences will likely go unnoticed by consumers. *Id*

When comparing the Red Mark to an Infringing Knife, it is apparent that a consumer would believe that the Infringing Knives are associated with or sponsored by Plaintiffs because each Infringing Knife contains the distinctive features of Plaintiffs' trademark, as depicted below:

| **Plaintiffs' Registration** | **Plaintiffs' Product** | **Defendants' Product** |
|:---:|:---:|:---:|
|  | |  |
| Source: Ex. 2 | Source: Ex. 47 | Source: Ex. 46 |

Plaintiffs' registration depicts a multifunction pocketknife, with all of its tools made of a silver metal material folded inward, and sandwiched between two red elongated oval-shaped scales with curved edges.

The Defendants' Infringing Knives contain two elongated oval-shaped red scales with curved edges which sandwich silver metal tools that are folded within the knife.  This design replicates Plaintiffs' protected Red Mark.  In addition, Defendants' device on the Infringing Knives contains a cross inside a shield that is very reminiscent of Plaintiffs' cross and shield device.  Because the Infringing Knives wholly incorporate the Red Mark and is closely similar to the Swiss Army Trade Dress, this factor weighs strongly in Plaintiffs' favor.

### 3.    The Products Are Identical

This factor examines the commercial proximity of both parties' products to consider whether consumers may be confused over the source of the products.  *Id.* (*citing Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d at 70, 77 (2d Cir. 1988)).  Where the products are similar and

designed for the same purpose, then the proximity is close to create a likelihood of confusion. *Id*. The respective products are identical, and therefore this factor weighs heavily in Plaintiffs' favor.

### 4. Because The Products Are Identical, There Is No Gap To Be Bridged.

Both parties sell red multifunction pocketknives so the products are in close proximity, and there is no gap to be bridged. *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc*., 800 F. Supp. 2d 515 (S.D.N.Y. 2011). This factor weighs in Plaintiffs' favor.

### 5. Instances of Actual Confusion

Although the Lanham Act does not require actual confusion in order for a claimant to recover, "[i]t is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion." *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003) (citation omitted).

In the brief time since the commencement of this lawsuit, Plaintiffs have become aware of at least two instances where members of the consuming public thought the Infringing Knives were Swiss Army Knives. The first instance of confusion occurred when a third party returned an Infringing Knife to Victorinox's offices in Connecticut for repairs. *See* Tenney Decl., Ex. 42; A Victorinox employee documented the return and then returned the knife to the consumer because Victorinox cannot repair counterfeit knives. Defendants confirmed that the returned knife is one of their Infringing Knives.

In another instance of consumer confusion, a young consumer posted a video on YouTube.com (available at *http://www.youtube.com/watch?v=REKno-ruJJU*), venting his frustration with having received one of Defendants' Infringing Knives when he intended to purchase one of Plaintiffs' Swiss Army Knives. *See* Tenney Decl., Ex. 43 120:21-122:3.

Because there are actual instances of confusion, this factor also weighs in Plaintiffs' favor. *See Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003).

### 6.    Sophistication of Relevant Purchasers

"When the products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care." *Recot, Inc. v. Becton*, 214 F.3d 1322 (Fed. Cir. 2000); *see also Melodrama Publ'g, LLC v. Santiago*, No. 12 Civ. 7830(JSR), 2013 WL 1700929, at *5 (S.D.N.Y. Apr. 11, 2013) (finding inexpensive products "are likely to be bought on impulse."). The suggested retail price of Defendants' Infringing Knives range from $5.95 (for a 7-function knife, SKA62C) to $32.95 (for a three piece "Executive Set" with two knives, a LED light, and cross and shield medallion, SKAKIT). *See* Tenney Decl., Ex. 49. The low cost of Defendants' knives suggest that they are an impulse purchase, and the purchasers of Defendants' knives will have a lower standard of purchasing care, such as the young consumer in the YouTube video, discussed above.  Even if the consumer is considered particularly sophisticated, it cannot be relied upon for preventing confusion where the products and the marks are identical, as they are here. *See N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 320 (S.D.N.Y. 2010) (*citing Morningside Group, Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 143 (2d Cir. 1999) (finding a likelihood of confusion and granting plaintiffs' motion for a preliminary injunction).  This factor also favors Plaintiffs.

### 7.    Quality of Defendants' Products

This factor examines whether the Defendants' products will cause injury to the Swiss Army Knife reputation. *See Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141 (2d Cir. 2003). Defendants have admitted that Infringing Knives are not of equal quality to Swiss Army Knives. *See* Tenney Decl., Ex. 43, 55:19-24. In addition, we have identified at least two instances of

confusion in connection with Defendants' Infringing Knives that evidence a lower quality. *See* Tenney Decl., Ex. 42, 48.  In the first instance described above, the Infringing Knife was being submitted to Victorinox for repair of a faulty corkscrew, and in the other instance (the YouTube video), the consumer was frustrated with the quality of the Infringing Knife.  Because consumers think that these Infringing Knives originate from Plaintiffs, the lower quality of the Infringing Knives is harming Plaintiffs' reputation associated with Swiss Army Knives. This factor also favors Plaintiffs.

### 8.     Defendants' Bad Faith Adoption of the Mark

Where a Defendant intentionally and slavishly copies a trademark, it is presumed that it intended to capitalize on the senior user's reputation and good will. *See Venetianaire Corp. of Am. v. A & P Import Co.*, 302 F. Supp. 156, 160 (S.D.N.Y. 1969) ("The slavish copying of plaintiff's trade dress would indubitably require a finder of fact to conclude, as a matter of law, that defendant, by its imitation of plaintiff's trademark, intended to cause confusion.").

Plaintiffs did not innocently choose a confusingly similar design. Defendants had full knowledge of Plaintiffs' Swiss Army Knives before they first started selling the Infringing Knives. Accordingly, bad faith may be inferred from Defendants' prior knowledge of Plaintiffs and their Swiss Army Knives.  *Mobil Oil Corp v. Pegasus Petroleum Corp*., 818 F.2d 254, 258-259 (2d Cir. 1987) ("Where we can perceive freedom of choice with full knowledge of a senior user's mark, we can readily read into defendant's choice of a confusingly similar mark the intent to get a free ride upon the reputation of a well-known mark.") (internal quotations omitted).

Instead of carving out its own niche in the marketplace, as discussed above, Defendants slavishly copied the distinctive and protectable elements of the Swiss Army Knives.  In addition to the physical similarities between the products, Defendants have also misappropriated Plaintiffs' SWISS ARMY trademark to further create a false association with Plaintiffs.

Defendants have referred to their infringing knives as "Swiss Army Knives", a "multi-function Army knife, and a "Army Knife" *See* Tenney Decl., Ex.  50, 51 & 52. In addition, a previous manufacturer of the Infringing Knives has referred to them as "Swiss Army Type" knives in invoices to Defendants. *See* Tenney Decl., Ex. 53.  This use of "type" is synonymous with counterfeit and conclusively establishes Defendants' bad faith misappropriation of Plaintiffs' Red Mark and Swiss Army Trade Dress.  Defendants contracted with this manufacturer to produce knockoff Swiss Army Knives.  In addition, Defendants' shield device, which is stamped on each Infringing Knife, is reminiscent of plaintiff Victorinox AG's incontestable U.S. Trademark Registration No. 3,077,338 for the cross and shield design. *See* Tenney Decl., Ex. 59.

   Going even further, there is ample evidence that Defendants actively copy Plaintiffs' product line, and *have even admitted to such conduct*.  Plaintiffs own U.S. Trademark Registration No. 1,674,989 for a watch bezel design and sell a watch in accordance with this design. *See* Tenney Decl., Ex. 54 .  Defendants copied this exact watch design, called it an "Alpine Army Quartz Watch" and sold it alongside the Infringing Knives. *See* Tenney Decl., Ex. 55. In addition, Defendants copied a knife with clock design that Plaintiffs' originally sold and admitted that this was a copy of Plaintiffs' product.  *See* Tenney Decl., Ex. 56, 40, 174:13-175:5.

   Defendants have also produced internal email correspondence which shows that they monitor Wenger's product line before they travel to China to find similar products. *See* Tenney Decl., Ex. 57.  Defendants did not innocently adopt Defendants shield device; rather, they purposely seek out copies of Plaintiffs' famous products. Lastly, Defendants have been accused of intellectual property infringement in at least six separate instances, where they copied third party trademarks or designs. *See* Tenney Decl., Ex. 58. This evidence demonstrates Defendants' propensity as a trademark counterfeiter and willful infringer.

## II.    DEFENDANTS CONDUCT VIOLATES NEW YORK COMMON LAW

In order for Plaintiffs to prevail on their claim of common law trademark infringement under New York Common Law, they must demonstrate that (1) they have a valid and legally protectable mark; (2) there is a likelihood of confusion resulting from Defendants' use of a similar mark.   *Horn's, Inc. v. Sanofi Beaute, Inc.,* 963 F. Supp. 318, 328 (S.D.N.Y. 1997) (citations omitted).

As explained in detail above, Plaintiffs' Red Mark and distinctive Swiss Army Trade Dress are valid and legally protectable and have acquired secondary meaning due to the duration of substantially exclusive use, the extensive sales and advertising, the overwhelming evidence of third party recognition of both the Red Mark and overall Trade Dress, and the conscious imitation of Swiss Army Knives in the marketplace.   Defendants are liable for infringement under New York Common Law.   While the standard showing of trade dress infringement follows an analysis under the Lanham Act, New York common law does not require a showing of secondary meaning. *Cartier*, 348 F. Supp. 2d at 251.   "New York law has concerned itself principally with whether or not the public is likely to be confused, rather than with whether the first comer's trade dress has acquired secondary meaning."   *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950, 953 (2d. Cir. 1980).

The evidence set forth above all demonstrates that Plaintiffs' Red Mark and Swiss Army Trade Dress are distinctive and the aforementioned analysis of the *Polaroid* factors demonstrates that there is a high likelihood of confusion.   Accordingly, Defendants infringe under New York law.

## III.    CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment.

Dated:  New York, New York EDWARDS WILDMAN PALMER LLP
   December 2, 2013

By: _____

 David Waild III (DW 9023)
 Rory J. Radding (RR 4042)
 H. Straat Tenney (HT 1224)

 750 Lexington Avenue
 New York, New York 10022
 212.308.4411

 *Attorneys for Plaintiffs/Counterclaim Defendants*
 *Victorinox AG; Victorinox Swiss Army, Inc.;*
 *and Wenger NA, Inc.*

-22-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 2, 2013 a true and correct copy of the foregoing

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY

JUDGMENT was filed with the Clerk of the Court using the CM/ECF system.  I also certify that

the foregoing document is being served on this day on all counsel listed below via the

transmission of Notices of Electronic Filing generated by CM/ECF.

> David M. Dahan
> Frank J. Colucci
> Katherine M. Lyon
> Colucci & Umans
> 218 East 50th Street
> New York, NY 10022-7681
> ddahan@colucci-umans.com
> fcolucci@colucci-umans.com
> klyon@colucci-umans.com

I further certify under penalty of perjury that the foregoing is true and correct.

Dated: December 2, 2013                          By:   */s/*_____
      New York, New York                                   H. Straat Tenney